IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON


JACKIE L. MEYER,                         )        Civil No. 04-6325-JE
                                         )
                    Plaintiff,           )
                                         )
         v.                              )        FINDINGS AND
                                         )        RECOMMENDATION
JO ANNE B. BARNHART,                     )
Commissioner of Social Security,         )
                                         )
                    Defendant.           )
_____)

        Kathryn Tassinari
        Robert Baron
        Cram, Harder, Wells & Baron, P.C.
        474 Willamette, Suite 200
        Eugene, OR 97401
             Attorneys for Plaintiff

        Karin J. Immergut
        U.S. Attorney
        Neil J. Evans
        Asst. U.S. Attorney
        1000 S.W. Third Avenue, Suite 600
        Portland, OR 97204-2902

        Richard M. Rodriguez
        Special Asst. U.S. Attorney
        Office of General Counsel
        Social Security Administration
        701 5th Avenue, Suite 2900 M/S 901
        Seattle, WA 98104-7075
             Attorneys for Defendants

JELDERKS, Magistrate Judge:

Plaintiff Jackie Meyer brings this action pursuant to 42 U.S.C. § 405(g) seeking judicial review of a final decision of the Commissioner of Social Security denying her applications for disability insurance benefits (DIB) and supplemental security income (SSI). The Commissioner's decision should be reversed.

## Procedural Background

Plaintiff filed her applications for DIB and SSI on June 27, 2001, alleging that she had been disabled since July 31, 1999, because of pain in her lower back and hips. Her applications were denied initially on May 7, 2002, and were denied upon reconsideration on July 25, 2002.

Pursuant to plaintiff's request, a hearing was held before Administrative Law Judge (ALJ) William Stewart, Jr., on May 9, 2004. Plaintiff; Kelly Chasteen, plaintiff's neighbor and friend; and Mark McGowan, a Vocational Expert (VE) testified at the hearing.

On May 27, 2004, the ALJ issued a decision finding that plaintiff was not disabled within the meaning of the Social Security Act (the Act). That decision became the final decision of the Commissioner on July 22, 2004, when the Appeals Council denied plaintiff's request for review. Plaintiff seeks review of that decision in the present action.

## **Factual Background and Medical Evidence**

Plaintiff was born on February 6, 1955, and was 49 years old at the time of the hearing. She left school after nine years because she was pregnant. Plaintiff has past relevant work experience as a food sales clerk and a cook, and last worked in 1999.

A substantial portion of the medical record is contained in the chart notes of Aimee Folsom (later Hansen), a family nurse practitioner who treated plaintiff for several years. During a visit on September 15, 1998, plaintiff reported severe pain in her low back extending down her right leg. Folsom noted that plaintiff limped on her right leg, and was unable to sit down or stand up straight. During an office visit on October 28, 1999, plaintiff again reported severe low back pain and pain in her right leg. Plaintiff reported that she had lost strength in her right leg, and walked with a limp. Folsom detected little reflex on plaintiff's right patellar.

During a visit to Folsom on February 21, 2000, plaintiff reported that she continued to have back pain, and that she was experiencing severe acid reflux every day. Folsom noted slight swelling between plaintiff's thoracic spine and left scapula, and diagnosed thorasic strain and esophogitis. Plaintiff reported continued back pain during visits on March 6, 2000, and March 30, 2000.

Plaintiff reported significant pain between her shoulder blades and neck during a visit on April 27, 2000.  Plaintiff reported that she experienced occasional numbness and weakness down both arms, and stated that the pain was worsening. Folsom administered injections at each of four trigger points, and diagnosed cervical and thoracic strain.  During a visit on May 4, 2000, plaintiff reported that the injections had not relieved her symptoms.

During a visit to Folsom on December 28, 2000, plaintiff stated that she had experienced pain in her low back since her last office visit, and that the pain had been severe only during the last one or two weeks before the visit.  Plaintiff reported that the pain was also in her right hip, and went down the right side of her leg.  Folsom noted decreased strength in plaintiff's right leg and a positive straight leg raising test, and diagnosed lumbosacral strain with radiculitis.  X-rays that Folsom ordered that day showed degenerative disk disease with spondylolisthesis of L4 on L5 and disk narrowing at L3-4 and L5-S1.

Folsom again noted right leg weakness on January 4, 2001, and diagnosed radicular symptoms.

An MRI taken on February 7, 2001, revealed mild to moderate circumferential stenosis of the L4-5 level and crowding of nerve roots.  A disk bulge at L4-5 displaced the

traversing right S1 nerve root slightly, and the potential for irritation was noted.

Dr. Rees Freeman, a neurosurgeon, examined plaintiff on April 9, 2001. Plaintiff told Dr. Freeman that her pain, which was keeping her in bed and preventing her from working, had started in her lower back, but had spread to her legs, feet, upper back, neck, and both arms. Plaintiff reported that she was constantly in pain, and that her "whole body hurts all over." Dr. Freeman noted that plaintiff cried, and was disheveled with greasy, matted hair and dirt under her sweater collar. He also observed that plaintiff was "very emotional and labile, very apparently depressed, unable to walk at all because of the pain incurred in her arms on getting up and her legs on trying to walk." Though plaintiff walked into the room without assistance and walked down the hall and left the office without assistance, she needed help walking to and getting onto the examining table. Plaintiff said her pain would not allow her to attempt "toe and/or heel walk."

Dr. Freeman noted that a straight leg raise to 90 degrees was negative bilaterally, that even "gentle pressure over the calves apparently elicits severe, excruciating pain," and that it was difficult to determine "true motor strength as per consistently inconsistent giveway per related pain causation during the testing of the lower extremities." He diagnosed

plaintiff with severe depression with emotional/labile component; question systemic inflammatory disease; thromophlebitis; and hip disease. Dr. Freeman added that there was a question as to a radicular component "as per lack of objective findings," and recommended nerve testing of L5-S1, checking of sedimentation rate, hip studies, and deep vein studies of plaintiff's lower extremities. He also stated that further attention should be given to plaintiff's "very apparent depression."

Lumbar spine X-rays taken on April 9, 2001 showed "normal curvatures" at L5-S1, and a low grade spondylolisthesis of L4 on L5. Disk space narrowing at L4-5 was noted. The radiologist opined that subluxation--a complete or partial dislocation--was probably caused by ligamentous laxity. Based upon his review of the X-rays, Dr. Freeman concluded that there was "no apparent present neurosurgical entity in evidence."

Folsom prescribed Prozac and Nexium during a visit on May 14, 2001. She diagnosed depression and gastritis, and noted that plaintiff reported pain in her sacroiliac joint. An X-ray taken that day showed plaintiff's right hip was normal.

Folsom next saw plaintiff on October 8, 2001. At that time, Folsom noted that plaintiff had palpable muscle spasms in the lumbar area. She diagnosed lumbosacral strain and

lumbar spondylosis, and had plaintiff sign a "narcotic contract."

An upper GI test conducted on November 28, 2001, showed the presence of a small sliding-type hiatal hernia with some gastroesophageal reflux without ulcerations or masses.

At the request of the agency, plaintiff was examined by Dr. Alison Prescott, a licensed psychologist, on February 21, 2002. Plaintiff reported that she had two children while she was a teenager, and that her children were taken away from her with no visitation rights because of substance abuse issues when she was 19 years old. Plaintiff reported that she had been married three times, and that her third husband was in prison. She had been living with her present boyfriend for 5 years at the time of the exam. Plaintiff reported that she had started drinking to excess as a child, had continued to do so for many years, and had begun using methamphetamine for pain relief in the late 1990s. She had been arrested for possession of methamphetamine, and reported that she had not used drugs or alcohol since completing a treatment program.

Dr. Prescott noted that plaintiff was carrying a cane when she arrived for the exam, and that her long hair appeared stringy. Plaintiff knew her date of birth, but could not calculate her age. Dr. Prescott noted that plaintiff exhibited significant pain behavior, shifting position often, and wincing and grimacing when she moved. Plaintiff reported

that she had started to have terrible pains in her back in
1997, and that she had been increasingly limited in her
ability to stand, lift, bend, and reach since that time.
Plaintiff stated that she did no cooking or housework, and
needed help to shower, wash her hair, and dress. She stated
that she did few errands, and did not go out much. Plaintiff
also reported that she had "a severe case of GURD or Reflux
disorder," and that she experienced severe heartburn and
frequently vomited after eating. Plaintiff exhibited distress
from heartburn pain, and ate Tums throughout the interview.

Testing indicated that plaintiff experienced severe
anxiety, and that she had poor working memory skills.
Dr. Prescott noted that plaintiff "appeared to be of
Borderline Intellectual functioning," performed in the Below
Average range on abstract reasoning tasks, and had a poor
general fund of information. She had difficulty with
concentration on tasks that required mental processing of
information. Plaintiff demonstrated poor perseverance, and
achieved a full scale IQ score of 74. Her test scores rated
her cognitive skills in the "Borderline" range.

The results of plaintiff's MMPI-2 testing were rated as
marginally valid. Dr. Prescott stated that this "could
indicate a 'faking bad' profile or a significant degree of
emotional/physical turmoil." She opined that plaintiff was
not intentionally "faking bad," but that testing was

consistent with the conversion of depression into physical symptoms.  She added that individuals who test with plaintiff's profile are "in a great deal of psychological turmoil," exhibit many symptoms of anxiety, and commonly feel depressed and hopeless.

Dr. Prescott diagnosed plaintiff with a Major Depressive Disorder, recurrent; a Generalized Anxiety Disorder; Alcohol Abuse (Sustained Full Remission); and Borderline Intellectual Functioning.  She rated plaintiff's GAF at 50.

Dr. Prescott completed a separate Rating of Impairment Severity Report dated March 3, 2002.  She rated plaintiff as having moderate restrictions in activities of daily living, mild impairment in social functioning, marked limitations in concentration, persistence or pace, and four or more episodes of decompensation lasting two weeks or longer during the year predating her evaluation.  Dr. Prescott indicated that plaintiff was demonstrating a "residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in environment would be predicted" to cause decompensation.

Plaintiff was examined by Dr. Allan Kirkendall, a licensed psychologist, on March 14, 2002.  Dr. Kirkendall reported that plaintiff walked into the interview slowly, using a cane, got up and down several times during the interview, and appeared to be in significant pain throughout

the interview. Dr. Kirkendall's report related plaintiff's description of her background, physical problems, and daily life, and noted that plaintiff considered her primary problem to be physical limitations caused by pain.

Dr. Kirkendall stated that plaintiff did not appear to exaggerate her problems, "did appear to be in a great deal of pain," and did not appear to be a malingerer. Though plaintiff had some problems concentrating, her vocabulary suggested average intelligence, and her social reasoning appeared to be intact. Plaintiff appeared to be sad and on the verge of tears at times. Dr. Kirkendall diagnosed plaintiff with an Adjustment Disorder with depressed mood and Alcohol and Methamphetamine Abuse, in sustained remission according to plaintiff's report. He noted that plaintiff reported a "high degree of social isolation and loneliness," and assessed a GAF of 60 based solely on plaintiff's psychological condition. Dr. Kirkendall concluded that plaintiff's "claim of unemployability" rested on her physical problems. He added that plaintiff's reaction to those problems appeared to be depression, "but this depression does not appear to be of such a significant nature that it would in of itself prevent her from working."

At the request of the agency, plaintiff was examined by Dr. Anthony Glassman, a physical medicine and rehabilitation specialist, on April 1, 2002. Dr. Glassman noted that

plaintiff reported right lumbosacral pain that did not extend
below the knee, and numbness and tingling in her right foot
when sitting or walking.  Dr. Glassman diagnosed plaintiff
with low back pain secondary to low grade spondylolisthesis,
with no objective evidence of radiculopathic process.  He
opined that plaintiff

> should be able to work at light duty lifting 20
> pounds occasionally and 10 pounds frequently.  I
> would expect the patient should be able to walk at
> least 6 hours per day in an 8-hour shift.  I do not
> feel it would be unreasonable if she took a 5-minute
> break every hour when performing excessive standing.
> She should avoid lumbar activities which emphasize
> hyperlordosis of the lumbar spine.

Pursuant to a referral from the agency, Dr. Prescott
examined plaintiff a second time on January 12, 2003.
Dr. Prescott noted that plaintiff walked into the interview
room with difficulty, using a cane.  Plaintiff reported that
her condition had worsened and her pain had spread to the back
of her left hip since the first examination nearly a year
earlier.  Plaintiff stated that she felt depressed, and stated
that she needed help with activities such as bathing and
brushing her hair.  Plaintiff reported that she had not been
to the grocery store for more than a month because of pain,
and that she had not been to church for six months because
sitting in a pew was uncomfortable.

Dr. Prescott noted that plaintiff appeared to be very
depressed and cried several times during the interview.  She
also noted that plaintiff demonstrated impaired concentration,

and diagnosed Major Depressive Disorder, recurrent; Generalized Anxiety Disorder; Alcohol Abuse (sustained full remission); and Borderline Intellectual functioning. Dr. Prescott rated plaintiff's GAF as 45, a 5-point decrease from the rating she had assigned following the earlier examination.

Dr. Prescott completed a "Rating of Impairment Severity Report," dated January 25, 2003, following the evaluation. Dr. Prescott indicated that plaintiff had marked restrictions of activities of daily living, marked limitation in social functioning, and marked limitation in concentration, persistence, or pace. She indicated that plaintiff's pain symptoms had increased during the previous year, resulting in increased depression and more limitation of activities. Dr. Prescott rated plaintiff's prognosis as "fair."

During a visit to Folsom on October 6, 2003, plaintiff reported increasingly severe low back pain, earaches, and neck pain. Folsom prescribed Methadone. During a visit on November 20, 2003, plaintiff reported that the Methadone was working well.

Dr. Glassman examined plaintiff a second time on December 11, 2003. At that time, plaintiff stated that pain medications gave her approximately 50% pain relief. Dr. Glassman noted no cognitive deficits or functional pain behavior, and noted that plaintiff could "sit to stand," turn,

and dress without difficulty.  He noted reduced pinprick sensation in bilateral index fingers and plantar surface, and in the right foot dorsum.  Dr. Glassman reported that, though plaintiff used a cane, she was able to heel walk and toe walk without difficulty with the cane.  A straight leg raising test was positive for calf pain on the right, both when plaintiff was sitting and lying down.  The Fabere test was positive on the right.

Dr. Glassman diagnosed plaintiff with low back pain with complaints of right L5 radiculopathy, which was manifested by positive straight leg raise and decreased sensitivity.  He also diagnosed bilateral upper extremity pain, which was greater on the right than on the left, and "[r]ule out C5 radiculopathy versus shoulder pathology."  Dr. Glassman recommended a workup "consisting of right hip and shoulder films as well as a lumbosacral MRI if these tests have not been recently done."  He placed plaintiff at a sedentary work level pending the outcome of these tests, and opined that plaintiff could perform light duty work if the recommended studies were "unremarkable."

Folsom increased plaintiff's Methadone dosage on January 9, 2004.

Dr. Prescott examined plaintiff a third time on March 2, 2004.  Plaintiff walked into the interview room slowly and with difficulty.  She used a cane, and showed more pain

behavior than she had during the two previous interviews. Plaintiff changed position frequently, appeared to be uncomfortable after sitting for a short period, and cried out when she sat down or got up. Dr. Prescott described plaintiff's affect as "very depressed and labile," described plaintiff's concentration as impaired, and noted that plaintiff demonstrated poor short-term memory.

Dr. Prescott administered the WAIS-III test, and concluded that the results accurately reflected plaintiff's cognitive skills. Plaintiff's full scale IQ score was 69, which Dr. Prescott noted was lower than plaintiff's previous score, and placed plaintiff in the "Extremely Low" range. Plaintiff's Verbal IQ score of 70 placed her in the Borderline range of cognitive skills.

The results of plaintiff's MMPI-2 testing were considered invalid because of elevations of the F scales. Dr. Prescott opined that this could indicate a "'cry for help' due to high endorsement of symptoms." She added that it was possible that plaintiff's "overall impairment with concentration and borderline intellectual skills affected the outcome."

Dr. Prescott found that plaintiff was credible in her presentation of pain symptoms and pain behavior, and concluded that plaintiff's depression was more severe than it had been the previous year, and that her daily activities were more

restricted.  Summarizing the results of her interview and
testing, Dr. Prescott stated that

> these results indicate that Ms. Meyer shows
> significant disability with regard to chronic pain
> and depression.  Both of these conditions have
> become more severe since first contact with this
> examiner 2 years ago.  Ms. Meyer shows greater
> restriction than 2 years ago of daily activities
> such as cooking, household chore, bathing
> independently, running errands, socializing,
> engagements in prior interests, or community
> activities such as going to church.  Her depression
> is demonstrated by mental status finds, restriction
> of activities, social isolation, her high level of
> distress in discussing prior trauma, and her poor
> coping skills.  Ms. Meyer led an active life before
> her arthritis became more severe in the late 1990's.
> She is very depressed due to her loss of functioning
> and activity as well as her chronic pain.

Dr. Prescott diagnosed Major Depressive Disorder,
recurrent; Alcohol (sustained full remission); and Borderline
Intellectual Functioning.  She rated plaintiff's GAF at 45.

Dr. Prescott completed a Mental Residual Function
Capacity Report dated March 4, 2004.  In that report,
Dr. Prescott rated plaintiff's ability to understand and
remember detailed instructions as "markedly limited."  She
also rated plaintiff as "markedly limited" in her ability to
carry out detailed instructions; ability to maintain attention
and concentration for extended periods; ability to perform
activities with a schedule, maintain regular attendance, and
be punctual with customary tolerances; ability to sustain an
ordinary routine without special supervision; ability to
complete a normal workday and workweek without interruptions

from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; and ability to accept instructions and respond appropriately to criticism from supervisors. Dr. Prescott described plaintiff's prognosis as "poor," and indicated that plaintiff's condition was expected to last at least 12 months.

In a letter dated March 25, 2004, Folsom and Dr. Fred Back, a physician with whom Folsom worked, stated that they agreed with the conclusions set out in Dr. Prescott's March 4, 2004 report.

## Hearing Testimony

1. Plaintiff

Plaintiff testified as follows at the hearing:

Plaintiff stopped working because pain prevents her from concentrating and focusing. Her boyfriend does most of the shopping, as well as all the cooking and other household chores, and her best friend, who lives nearby, helps plaintiff when she can. Plaintiff throws up often because of her ulcers.

Plaintiff's mind wanders when she tries to do crossword puzzles, read, or watch television. She spends much of the day in bed because her furniture is uncomfortable. Plaintiff cries often. Plaintiff's boyfriend has to help her bathe and

wash her hair.  Her hands shake a lot and she has muscle
spasms.  Dr. Freeman told her that surgery will not help
because there is no cure for spondylitis arthritis.

Plaintiff does not go to the store very often.  When she
does, she uses a motorized cart and her friend does the heavy
lifting and carries the groceries into plaintiff's house.  Her
boyfriend puts the groceries away.  If she goes out of the
house, she is very sore the next day.

Plaintiff would have trouble performing a sedentary job
because her concentration is poor.  She can neither sit all
the time nor stand all the time.  Though she used to be a
quick cashier, plaintiff fears that she would "space out" now.
Plaintiff does not deal well with people she does not know.


2. <u>Kelly Chasteen</u>

Kelly Chasteen, a lay witness, testified as follows at
the hearing:


Ms. Chasteen has known plaintiff since 1995.  She lives
across the street from plaintiff, and visits her about three
times a week.  Ms. Chasteen has observed that plaintiff has
difficulty sitting, standing, walking for any length of time,
or doing anything.  She has seen plaintiff cry because of
pain, and hears her give out "a very loud yell" when she steps
out of bed.  Plaintiff usually rides in an electric cart when

she shops.  Plaintiff is slower than she used to be when
playing cards, and needs help calculating scores.  Her
condition worsened during the year preceding the hearing.


3. <u>VE Mark McGowan</u>

Mark McGowan, a VE, testified that plaintiff had worked
as a food sales clerk, a light, semi-skilled position, and as
a cook, a medium, skilled position.

The ALJ posed a hypothetical describing a person with
plaintiff's age and education, and who is

> limited from lifting and carrying more than ten
> pounds frequently with an occasional 20-pound
> maximum.  She's limited to occasional stair
> climbing, balancing, stooping, kneeling, crouching,
> and crawling.  She needs an occasional opportunity
> to change position and get off her feet.  She has
> impaired concentration and attention that would
> limit understanding, remembering, and carrying out
> directions to the extent that she would require
> simple unskilled work of a predictable nature.
> She's also limited to only occasional brief public
> contact.

The VE testified that the individual described could not
perform plaintiff's past work, but could work as a marker, an
electronics worker, or an office helper.

In response to questioning by plaintiff's attorney, the
VE testified that an individual with one or any combination of
the marked limitations noted in Dr. Prescott's mental residual
functional capacity report dated March 4, 2004, could not
perform the work he had identified.  He also testified that an
individual who was more than occasionally unproductive for 10

to 15 minutes at a time because of vomiting would not be employable.  The ALJ further testified that employers do not generally tolerate more than one absence per month on an ongoing basis.

## **Disability Analysis**

The ALJ engages in a five-step sequential inquiry to determine whether a claimant is disabled within the meaning of the Act.  20 C.F.R. §§ 404.1520, 416.920.  Below is a summary of the five steps, which also are described in <u>Tackett v. Apfel</u>, 180 F.3d 1094, 1098-99 (9th Cir. 1999).

<u>Step One</u>.  The Commissioner determines whether the claimant is engaged in substantial gainful activity (SGA). A claimant engaged in such activity is not disabled.  If the claimant is not engaged in substantial gainful activity, the Commissioner proceeds to evaluate the claimant's case under Step Two.  20 C.F.R. § 404.1520(b).

<u>Step Two</u>.  The Commissioner determines whether the claimant has one or more severe impairments.  A claimant who does not have such an impairment is not disabled.  If the claimant has a severe impairment, the Commissioner proceeds to evaluate claimant's case under Step Three.  20 C.F.R. § 404.1520(c).

<u>Step Three</u>.  Disability cannot be based solely on a severe impairment; therefore, the Commissioner next determines

whether the claimant's impairment "meets or equals" one of the impairments listed in the SSA regulations, 20 C.F.R. Part 404, Subpart P, Appendix 1. A claimant who has such an impairment is disabled. If the claimant's impairment does not meet or equal one listed in the regulations, the Commissioner's evaluation of the claimant's case proceeds under Step Four. 20 C.F.R. § 404.1520(d).

Step Four. The Commissioner determines whether the claimant is able to perform work he or she has done in the past. A claimant who can perform past relevant work is not disabled. If the claimant demonstrates he or she cannot do work performed in the past, the Commissioner's evaluation of the claimant's case proceeds under Step Five. 20 C.F.R. § 404.1520(e).

Step Five. The Commissioner determines whether the claimant is able to do any other work. A claimant who cannot perform other work is disabled. If the Commissioner finds that the claimant is able to do other work, the Commissioner must show that a significant number of jobs exist in the national economy that the claimant can do. The Commissioner may satisfy this burden through the testimony of a vocational expert (VE) or by reference to the Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2. If the Commissioner demonstrates that a significant number of jobs exist in the national economy that the claimant can do, the

claimant is not disabled.  If the Commissioner does not meet
this burden, the claimant is disabled.  20 C.F.R.
§ 404.1520(f)(1).

At Steps One through Four, the burden of proof is on the
claimant.  <u>Tackett</u>, 180 F.3d at 1098.  At Step Five, the
burden shifts to the Commissioner to show that the claimant
can perform jobs that exist in significant numbers in the
national economy.  <u>Id.</u>

## ALJ's Decision

The ALJ found that plaintiff had not engaged in
substantial gainful employment since the date of the alleged
onset of her disability.  He found that she had an adjustment
disorder with depressed mood, a history of substance abuse,
borderline intellectual functioning, and degenerative disc
disease with spondylolisthesis.  The ALJ concluded that these
impairments were severe, but did not meet or medically equal
the criteria in the Listings.  The ALJ concluded that
plaintiff had mild restriction in activities of daily living,
moderate difficulties in maintaining concentration,
persistence, or pace, and no repeated extended periods of
decompensation.

In reaching these conclusions, the ALJ found that
plaintiff was not fully credible, and rejected the conclusions
of Dr. Prescott, Dr. Black, and Licensed Nurse Practitioner

Folsom.  He rejected the lay testimony of Kelly Chasteen on the grounds that it simply "reflect[ed] the claimant's dramatic, exaggerated behavior."

The ALJ found that plaintiff had the limitations that he had set out in his hypothetical to the VE.  Based upon the VE's testimony, he concluded that plaintiff could not perform her past relevant work, but retained the ability to work as a marker, an electronics worker, or an office helper.  Accordingly, the ALJ found that plaintiff was not disabled within the meaning of the Social Security Act.


## **Standards**

A claimant is disabled if he or she is unable "to engage in substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  The initial burden of proof rests upon the claimant to establish his or her disability.  Roberts v. Shalala, 66 F.3d 179, 182 (9th Cir. 1995), cert. denied, 517 U.S. 1122 (1996).  The Commissioner bears the burden of developing the record.  DeLorme v. Sullivan, 924 F.2d 841, 849 (9th Cir. 1991).

The district court must affirm the Commissioner's decision if it is based on proper legal standards and the findings are supported by substantial evidence in the record

as a whole.  42 U.S.C. § 405(g); <u>see also</u> <u>Andrews v. Shalala</u>, 53 F.3d 1035, 1039 (9th Cir. 1995).  "Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Andrews</u>, 53 F.3d at 1039.  The court must weigh all of the evidence, whether it supports or detracts from the Commissioner's decision.  <u>Martinez v. Heckler</u>, 807 F.2d 771, 772 (9th Cir. 1986).  The Commissioner's decision must be upheld, however, even if "the evidence is susceptible to more than one rational interpretation." <u>Andrews</u>, 53 F.3d at 1039-40.

## **Discussion**

Plaintiff contends that the ALJ erred in failing to provide legally sufficient reasons for rejecting the opinion of Dr. Prescott, an examining psychologist, failed to give "proper consideration" to the opinion of the treating nurse practitioner, and failed to meet the burden of establishing that plaintiff could perform work that existed in substantial numbers in the national economy.

1. <u>ALJ's rejection of Dr. Prescott's opinion</u>

Opinions of examining physicians are entitled to greater weight than those of nonexamining physicians.[1]  <u>Pitzer v. Sullivan</u>, 908 F.2d 502, 506 (9th Cir. 1990).  An ALJ must provide clear and convincing reasons for rejecting the uncontradicted opinion of an examining physician, <u>id.</u>, and must provide specific and legitimate reasons that are supported by substantial evidence in the record for rejecting an examining physician's opinion that is contradicted by another physician.  <u>Andrews v. Shalala</u>, 53 F.3d 1035, 1043 (9th Cir. 1995).

As noted above, in 2002, Dr. Prescott rated plaintiff as having moderate restrictions in activities of daily living, mild impairment in social functioning, marked limitations in concentration, persistence, or pace, and four or more episodes of decompensation.  In 2003, Dr. Prescott found that plaintiff's limitations were more severe: she determined that plaintiff's restrictions of activities of daily living, impairment in social functioning, and limitations in concentration, persistence, or pace were all "marked."  In 2004, Dr. Prescott rated plaintiff's ability to understand and remember detailed instructions as "markedly limited."  She also rated plaintiff as "markedly limited" in her ability to

---

[1]Though psychologists are not medical doctors, because they are "acceptable medical sources" of disability evidence, they are regarded as "physicians" in analyzing disability claims. <u>McAllister v. Sullivan</u>, 888 F2d 599, 603 n.3 (1989).

carry out detailed instructions; ability to maintain attention and concentration for extended periods; ability to perform activities with a schedule, maintain regular attendance, and be punctual with customary tolerances; ability to sustain an ordinary routine without special supervision; ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; and ability to accept instructions and respond appropriately to criticism from supervisors. In her 2002, 2003, and 2004 evaluations, Dr. Prescott diagnosed a Major Depressive Disorder.

Discussing Dr. Prescott's 2002 evaluation, the ALJ rejected Dr. Prescott's conclusion that plaintiff had problems with eating, on the grounds that plaintiff's weight, 189 pounds at the time of the evaluation, did not "comport" with a "severely disrupted" eating ability, and because he concluded that the record showed that plaintiff "had not lost any weight." He discredited any assertion that plaintiff's decision to stay in bed most of the time reflected "any psychological impairment" because it appeared to be a "self-restriction." He rejected any assertion that plaintiff was "isolated, avoidant, or housebound," observing that plaintiff had friends, received visitors in her home, went to church on most Sundays, and enjoyed her church community. The ALJ

rejected the assertion that plaintiff had problems of
concentration because plaintiff told Dr. Prescott that she
read every day and worked crossword puzzles:  he concluded
that "[s]uch activity would not be possible for someone with
such cognitive limitations."

The ALJ also faulted Dr. Prescott for "factoring in
claimant's self-reported physical limitations," asserting that
plaintiff's "reports regarding her physical diagnoses are not
always in agreement with objective evidence, as . . . when the
claimant told Dr. Freeman that she had multiple bone spurs on
both hips when, in fact, a hip series had already shown that
her hips were normal."  He added that it seemed likely that
plaintiff "exaggerated psychological symptoms in parallel to
her exaggeration of her physical symptoms."  As an example of
this "exaggeration," the ALJ noted that plaintiff used a cane,
"which is not prescribed."

In discussing Dr. Prescott's 2003 evaluation, the ALJ
rejected Dr. Prescott's assessment of a GAF of 45 on the
grounds that Dr. Prescott appeared to have improperly taken
plaintiff's physical limitations and other factors into
account.  He concluded that Dr. Prescott's determination that
plaintiff had "marked" limitations was not supported by her
own report, because plaintiff "did some dishes and light
cleaning, she did laundry with help lifting the laundry
basket, she did some grocery shopping (although not recently),

and she did some cooking . . . ."  The ALJ rejected

Dr. Prescott's conclusion that plaintiff was markedly

restricted in social functioning, observing that "claimant

reported that she visited with a friend on a regular basis and

they watched movies together, and she played video games at

her neighbor's house," and that, during the evaluation,

plaintiff "demonstrated good social skills and she had a good

sense of humor."  He rejected Dr. Prescott's conclusion that

plaintiff had experienced periods of decompensation and that

plaintiff had experienced increased depression and restriction

of activities during the previous year as "purely

speculative."  The ALJ observed that plaintiff had not

"required mental health treatment other than antidepressant

medication," and had no psychiatric hospitalizations.  He

concluded that Dr. Prescott had erroneously relied on

plaintiff's own representations, which he found were

"unreliable."  He also cited Dr. Kirkendall's opinion that,

though plaintiff had a depressive reaction to her physical

problems, her depression was not significant enough to prevent

her from working.

Though he summarized Dr. Prescott's 2004 evaluation and

noted that Dr. Prescott assessed a GAF of 45 at that time, the

ALJ did not explicitly state his reasons for disagreeing with

the conclusions Dr. Prescott set out in her 2004 report.

To the extent that Dr. Prescott's conclusions were not wholly consistent with some medical evidence in the record, the ALJ did not provide the specific, legitimate reasons, supported by substantial evidence in the record, that was required to reject the opinion of an examining physician. To the extent that the ALJ rejected portions of Dr. Prescott's findings that were not contradicted, the ALJ failed to provide the requisite clear and convincing reasons for rejecting her opinions. Most significantly, Dr. Prescott's opinions were based upon the objective results of repeated psychological testing that was not performed by other medical sources cited by the ALJ. Her opinions were also based upon the three clinical examinations she performed. Dr. Kirkendall neither performed psychological testing himself, nor had Dr. Prescott's reports to review when he formed his opinions. Dr. Glassman, who stated in 2002 that plaintiff could perform light work and stated in 2003 that plaintiff could perform sedentary work, had no medical records to review, and was unaware that an MRI and x-rays showed that plaintiff had spondylolisthesis and spinal stenosis.

Turning to the grounds on which the ALJ rejected various portions of Dr. Prescott's opinions, I note that the ALJ's assertion that plaintiff's weight did not "comport" with a "severely disrupted" eating ability was not relevant. The issue was not whether plaintiff was thin or undernourished,

but whether eating caused plaintiff significant discomfort. The medical record includes objective findings of gastroesophageal reflux, a condition of which plaintiff complained since early 2000. The medical record fully supports plaintiff's assertion that she suffered from gastric distress, and Dr. Prescott's related citation of that problem.

The ALJ's characterization of plaintiff's decision to stay in bed much of the day as a "self restriction" that is unrelated to a psychological impairment does nothing to undermine Dr. Prescott's opinion. Plaintiff herself testified that she stayed in bed because she was generally uncomfortable elsewhere, and Dr. Prescott, as a trained psychologist, was better placed than the ALJ to draw any inferences regarding plaintiff's psychological condition from that behavior. Nothing in the medical record suggests that an individual's "self restriction" to stay in bed most of the time may not reflect a psychological impairment.

The ALJ's assertion that Dr. Prescott erroneously characterized plaintiff as isolated is not supported by the record. Though there is evidence that plaintiff had a few friends and did attend church for a time, the record supported the conclusion that plaintiff had very few social contacts, and that by 2004 she attended church only occasionally. Likewise, the ALJ's assertion that plaintiff did not have concentration problems because she did some reading and worked

crossword puzzles does not constitute legitimate reasons,
supported by substantial evidence in the record, for rejecting
Dr. Prescott's assessment of plaintiff's cognitive
limitations.  Dr. Prescott based her conclusions about
plaintiff's concentration and cognitive skills on objective
testing, which revealed borderline intelligence and showed
that plaintiff had difficulty retaining information long
enough to process it.  Plaintiff testified that she had
difficulty concentrating while carrying out those activities,
and Ms. Chasteen testified that she had to help plaintiff
calculate scores when they played games.  In any event, the
ability to engage in activities such as reading and playing
games at home does not establish that a claimant can maintain
the concentration to complete a full work day.  E.g., Vertigan
v. Halter, 260 F.3d 1044, 1050 (9th Cir. 2001) (mere fact that
claimant may perform certain daily activities does not mean
she can sustain concentration needed to work).

Plaintiff's assertion to Dr. Freeman that she had bone
spurs on her hips when x-rays had shown that her hips were
normal is not evidence that plaintiff misrepresented her
physical condition.  Though the x-rays in question were
considered normal, they did reveal bone spurs.  Because
plaintiff has not directly challenged the ALJ's determination
that she was not wholly credible, I need not decide whether
the ALJ provided sufficient support for that determination.

However, in her memorandum, plaintiff did address a number of the reasons the ALJ provided for concluding that plaintiff was not wholly credible, and many of her criticisms of that conclusion are well founded.  Though plaintiff may not have been accurate in every detail, her testimony at the hearing and statements to medical care providers were generally consistent, and are generally consistent with objective evidence in the record.  Accordingly, the ALJ's assertion that Dr. Prescott erred in basing her opinion on  plaintiff's statements carries little weight.  In addition, a careful reading of Dr. Prescott's reports supports only the conclusion that Dr. Prescott's opinions were largely based on objective testing and her own observations.  Dr. Prescott's conclusion that plaintiff's condition was not only serious but worsened over time was supported by objective evidence.

Dr. Prescott's opinions were supported by objective psychological testing and by repeated clinical examinations. The ALJ did not support his rejection of those opinions with legally sufficient reasons.

When an ALJ has provided inadequate reasons for rejecting the opinion of a treating or examining physician, that opinion is credited as a matter of law.  Lester v. Chater, 81 F.3d 821, 834 (9th Cir. 1995).  A reviewing court then has discretion to remand for further administrative proceedings or

for a finding of disability and an award of benefits.  <u>See</u>, <u>e.g.</u>, <u>Stone v. Heckler</u>, 761 F.2d 530, 533 (9th Cir. 1985).

Whether an action is remanded for an award of benefits or for further proceedings depends on the likely utility of additional proceedings.  <u>Harman v. Apfel</u>, 211 F.3d 1172, 1179 (9th Cir. 2000).  A reviewing court should credit evidence and remand for a finding of disability if: 1) The ALJ failed to provide legally sufficient reasons for rejecting the evidence; 2) there are no outstanding issues to be resolved before a determination of disability can be made; and 3) it is clear from the record that the ALJ would be required to find the claimant disabled if the evidence in question were credited. <u>Smolen v. Chater</u>, 80 F.3d 1273, 1292 (9th Cir. 1996).

In determining whether a claimant's mental impairment meets a listed impairment, the Commissioner considers both whether the diagnostic criteria, or "paragraph A" criteria are met, and whether specified functional restrictions, or "paragraph B" criteria, are present.  20 C.F.R. 404.1520a. The criteria set out in both paragraphs A and B must be satisfied to meet the listings.  Claimants are conclusively deemed disabled if their condition meets a listed impairment. 20 C.F.R. § 404.1520(d).

If accepted, Dr. Prescott's conclusions establish that plaintiff meets the "A" criteria, because Major Depression,

which Dr. Prescott diagnosed in 2002, 2003, and 2004, is an affective disorder that satisfies that criteria.

If accepted, the limitations that Dr. Prescott found also satisfy the requirements for establishing disability under the "B" criteria of Listing 12.04 (Affective Disorders). 20 C.F.R. Pt. 404, Subpart P, Appendix 1, § 12.04. The requirements of this Listing are satisfied if a claimant's disturbance in mood results in a "marked" restriction of at least two of the four functional areas. No. 12.04 of Impairment Listings, Appendix 1, Subpart P, Social Security Regulations No. 4. Dr. Prescott found marked limitations in two of the four areas in 2002, and found marked limitations in all four areas in 2003. In addition, the VE testified that an individual with the limitations that Dr. Prescott assessed in 2004 would not be able to perform any work.

The ALJ provided legally insufficient reasons for rejecting the opinion of Dr. Prescott, which were based upon repeated testing and clinical examinations. The record is complete, and there are no outstanding issues to be resolved before a determination of disability can be made: If the opinion of Dr. Prescott is credited, an ALJ clearly would be required to find plaintiff disabled. This action should therefore be remanded for an award of benefits.

2. <u>ALJ's failure to credit opinion of treating nurse</u>
<u>practitioner</u>

My conclusion that this action should be remanded for an award of benefits for the reasons set out above makes it unnecessary to address plaintiff's contention that the ALJ improperly rejected the opinion of Folsom, plaintiff's treating nurse practitioner. However, in order to create a complete record on review, I will briefly address this issue.

As noted above, Folsom, plaintiff's treating nurse practitioner, and Dr. Black, with whom she worked, expressed their agreement with Dr. Prescott's third psychological report in a letter dated March 25, 2004. In rejecting the opinions of Folsom and Dr. Black, the ALJ stated that there was no evidence that Dr. Black had treated plaintiff, and that Folsom was not an acceptable medical source. The ALJ noted that Folsom was "not a mental health provider," and asserted that "[a]ny crossover to the physical realm that Dr. Prescott made" was not within Folsom's "scope of expertise." He added that the opinions of Folsom and Dr. Black concerning plaintiff's limitations "are simply not credibly supported."

The ALJ's assertion that Folsom was not an "acceptable medical source" is correct, in that nurse practitioners are not listed among the professionals who may provide a diagnosis. <u>See</u> 20 C.F.R. §§ 404.1513(a), 416.913(a). However, nurse practitioners are specifically cited as a

source of evidence concerning the severity of a claimant's impairments and how those impairments affect a claimant's ability to work. 20 C.F.R. §1513(d)(1).

As a nurse practitioner, Folsom was authorized, and did prescribe, psychotropic medication to plaintiff. <u>See</u> O.R.S. 678.390; TR 211 (prescribing plaintiff Prozac for depression). The record establishes that Folsom treated plaintiff for several years, and had relatively frequent contact with plaintiff during that period. Her opinion, like the opinion of Dr. Black, under whose supervision it appears she provided her services, was consistent with that of the only psychologist to repeatedly both examine and test plaintiff. Under these circumstances, Folsom's opinion was entitled to greater weight than was accorded by the ALJ, and the ALJ needed to provide more substantial reasons for rejecting the opinion.


3. <u>ALJ's conclusion that plaintiff could perform "other work"</u>

Plaintiff contends that the ALJ failed to establish that she could perform "other work" that exists in the national economy. I agree. The VE testified that the marked limitations that Dr. Prescott found in plaintiff's residual functional capacity would preclude performance of either the positions that the ALJ had identified or other work. As noted above, the ALJ did not properly support his rejection of

Dr. Prescott's opinion.  With that opinion accepted, the VE's testimony establishes that plaintiff cannot perform competitive employment.

## Conclusion

A final judgment should be entered REVERSING the Commissioner's decision and REMANDING this action for an award of benefits.

## Scheduling Order

The above Findings and Recommendation are referred to a United States District Judge for review.  Objections, if any, are due August 23, 2005.  If no objections are filed, review of the Findings and Recommendation will go under advisement on that date.

A party may respond to another party's objections within 10 days after service of a copy of the objection. If objections are filed, review of the Findings and Recommendation will go under advisement upon receipt of the response, or the latest date for filing a response.

DATED this 5th day of August, 2005.

/s/  John Jelderks
John Jelderks
U.S. Magistrate Judge